UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Violations: |
| | ) |
| v. | ) Count One: Bank Fraud |
| | ) (18 U.S.C. § 1344) |
| DAVID EBRAHIMZADEH, | ) |
| | ) Counts Two and Three: Wire Fraud Affecting a |
| Defendant | ) Financial Institution |
| | ) (18 U.S.C. §§ 1343 and 3293(2)) |
| | ) |
| | ) Count Four: Wire Fraud |
| | ) (18 U.S.C. § 1343) |
| | ) |
| | ) Counts Five and Six: Procuring the Filing of a |
| | ) False Tax Return |
| | ) (26 U.S.C. § 7206(2)) |
| | ) |
| | ) Forfeiture Allegation: |
| | ) (18 U.S.C. § 982(a)(2)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

*Overview*

1.     Following the outbreak of COVID-19, defendant DAVID EMBRAHIMZADEH fraudulently obtained more than $8 million in pandemic relief loans from the United States, including from the Paycheck Protection Program ("PPP"), the Economic Injury Disaster Loan ("EIDL") program, and the Main Street Lending Program ("MSLP"). Over approximately two and one-half years, he obtained these loans from the Small Business Administration (the "SBA") and the Federal Reserve Bank of Boston (the "Boston Fed") through defunct and ineligible companies and by providing false financial information. EBRAHIMZADEH used the criminal proceeds from his fraud to fund real estate investments, pay off debts, buy luxury products, and

pay personal expenses.

*The Defendant*

2.      EBRAHIMZADEH lived in New York, where he owned and operated Corniche Capital, LLC ("Corniche Capital").  EBRAHIMZADEH was at all times Corniche Capital's sole employee and officer.

*Relevant Persons*

3.      Person 1 was a senior executive and loan officer at Bank A.

4.      Person 2 was a businessman in New Jersey, who offered credit repair services.

5.      Person 3 was a member of EBRAHIMZADEH's extended family.

6.      Person 4 was a business associate of EBRAHIMZADEH who owned a real estate development company that partnered with Corniche Capital on real estate projects.

7.      Person 5 was a member of EBRAHIMZADEH's family and owned Company A, a locks and locksmith equipment wholesaler located in Pennsylvania.

8.      Person 6 was a tax preparer in New Jersey.

*Relevant Entities that Ebrahimzadeh Controlled*

9.      Corniche Capital held itself out to the public on its website as an "opportunistic investing firm in both the private and public sectors," with the "investing objective" of generating "out-sized returns with both current income and long-term capital appreciation through equity and debt investments."

10.     Corniche Capital partnered with other real estate investors and developers to buy and hold commercial real estate.  The company earned money by selling properties, developing properties, and leasing commercial properties to other businesses, which paid rent to Corniche Capital or to limited liability companies ("LLCs") that it controlled.

11.    Corniche SRY was a real estate investment holding company that EBRAHIMZADEH controlled through Corniche Capital.

12.    NM Gas Holdings 1 LLC, NM Gas Holdings 2 LLC, NMGH 1C LLC, NMGH 1D LLC, NMGH 1E LLC, and NMGH 1F LLC were real estate holding companies that EBRAHIMZADEH organized as Wyoming LLCs in 2016.    The State of Wyoming administratively dissolved each of these entities in 2018.  None of these entities reported gross receipts or income to the Internal Revenue Service ("IRS") in 2019.

13.    2501 North 15th St. Owner LLC ("2501 North") was a Wyoming real estate entity. EBRAHIMZADEH and Person 4 registered 2501 North in September 2016 to own a commercial property in Pennsylvania that they sold in July 2019.  Wyoming administratively dissolved 2501 North in November 2019.  By the end of 2019, 2501 North's net value was $622, and it had no employees, operations, or property.

14.    Bentley Ridge ALF Holdings LLC ("Bentley Ridge") was a Florida entity that EBRAHIMZADEH and Person 4 registered in May 2018 to own and develop a tract of land in Florida.

15.    Diamante Holdings LLC ("Diamante Holdings") was a Wyoming entity that EBRAHIMZADEH registered in July 2017.  Wyoming administratively dissolved the company in September 2018.

16.    West York Holding LLC ("West York") was a New Jersey company that EBRAHIMZADEH and another individual registered in February 2020.  It therefore had no operations and no revenue in 2019.

17.    Burbury Management, Inc.  was registered as a New York corporation in August 2016. The company first obtained a federal Employee Identification Number ("EIN") on or about

July 28, 2020, listing Person 3 as its sole officer, and it did not report any gross receipts to the IRS in 2019.

18.    Great Neck Sky, LLC was registered as a New York corporation in July 2017.  The company first obtained a federal EIN on or about August 5, 2020, listing Person 3 as its sole officer, and it did not report any gross receipts to the IRS in 2019.

19.    Person 4 registered Brick House New York LLC in New York in 2020 at EBRAHIMZADEH's direction for the purpose of acquiring a seven-bed, eight and one-half bath, 8,700 square foot single-family personal residence in Long Island (the "First Hamptons House") for EBRAHIMZADEH using MSLP funds.

20.    Person 5 registered 23 KW LLC in New York in 2021 for the purpose of acquiring a seven-bed, 12 bath, 9,300 square foot personal residence in Long Island (the "Second Hamptons House") for EMBRAHIMZADEH and a relative using MSLP funds.

21.    Bank A in Florida, Bank B in Pennsylvania, Bank C in New York, and Bank D in Massachusetts were financial institutions, with deposits insured by the Federal Deposit Insurance Corporation.

22.    The SBA was a federal agency that provided financial support to businesses.

23.    The Boston Fed was part of the Central Bank of the United States and was headquartered and operated in Boston, Massachusetts.

24.    The IRS was an agency of the Department of the Treasury that administered the tax laws of the United States.  It processed electronic tax filings at regional centers, including one in Andover, Massachusetts.

*The CARES Act and Pandemic Relief Loan Programs*

25.     Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in March 2020 to provide financial aid to businesses impacted by the COVID-19 pandemic.

PPP Loans

26.     The PPP was a CARES Act program that  provided forgivable loans to eligible small businesses to fund job retention and to pay for certain other business expenses so that small businesses could remain afloat and their employees maintain employment during the pandemic.

27.     Congress placed the PPP under the SBA's authority and authorized the SBA to guarantee PPP loans under the same terms as its established program for small business loans that did not allow loans to certain kinds of business, including "passive businesses owned by developers and landlords that do not actively use or occupy the assets acquired or improved with loan proceeds," businesses "engaged in any activity that is illegal," and "speculative businesses."

28.     To obtain a PPP loan, a business had to submit a PPP loan application to a participating bank.  The application required certifications about business eligibility under the SBA's rules and details about the applicant's business (*e.g.*, number of employees and average monthly payroll expenses) and about the person submitting the application.  It also required an attestation that the information in the application was accurate.

29.     The PPP loan application included an instruction to calculate average monthly payroll by using the business' average monthly payroll for 2019, excluding annual costs over $100,000 per employee.  Accordingly, the maximum average monthly payroll for a single employee was $8,333.  The PPP loan application specified that the loan amount equaled the average monthly payroll multiplied by 2.5, meaning that the largest possible PPP loan for a one-employee business was $20,833 ($8,333 x 2.5).

30.     PPP loan proceeds could only be used to pay permissible expenses, including payroll costs, mortgage interest, rent, and utilities. The interest and principal on the PPP loan were eligible for forgiveness if the business spent PPP loan proceeds on these expense items within a set period of time and used a certain portion of the loan (at least 60 percent) for payroll expenses.

The EIDL Program

31.     The CARES Act expanded the SBA's existing EIDL program to provide relief in the form of loans on favorable terms to eligible small businesses that experienced a loss in revenue during the pandemic. Businesses were ineligible for EIDL loans if the business or any principal of the business was engaged in, among other things, lending, speculation, or investment, other with in property held out for rental at the time of the disaster, or was engaged in "any illegal activity."

32.     The EIDL program provided low-interest loans to pay for expenses that could have been paid with ordinary business revenue, or would not have existed, had the pandemic not occurred. Eligible expenses included payroll, paid sick leave, increased production costs due to supply chain disruptions, and business obligations, such as debts, rent, and mortgage payments.

33.     A qualifying business submitted an EIDL application directly to the SBA. The application required the business to make certain certifications, including attestations that the borrower had not paid undisclosed fees to any entity to prepare the application and that the information in the application was accurate, and to provide information such as the gross revenues and cost of goods sold for the twelve months before January 31, 2020.

MSLP

34.     The MSLP was another CARES Act program created that supported businesses adversely affected by the pandemic. Although subject to SBA eligibility rules, the MSLP was administered by the Boston Fed. As part of the MSLP, the Secretary of the Treasury and the

Federal Reserve Board created a government-owned entity to fund 95 percent of MSLP loans made by private lenders, which funded the remaining five percent of the MLSP loans they originated.

35.     As part of the MSLP, lenders had to vet the financials of companies applying for loans using their usual underwriting process, but did not have to perform due diligence on representations made by potential borrowers regarding loan eligibility and could rely on the borrower's sworn certifications.  If a borrower satisfied a participating lender's underwriting criteria, the lender electronically transmitted the MSLP application, with supporting documents such as the loan agreement and borrower certifications, to the Boston Fed.  After review and approval, the Boston Fed directed Bank D to wire funds to the participating lender to fund the loan.

36.     Bank D wired MSLP funds to lenders for disbursement to borrowers through its server located in Grafton, Massachusetts.

37.     As part of the MSLP application, as required by statute, the borrower and the borrower's chief financial officer, or a similar employee, had to certify, among other things, that the borrower was an eligible business under SBA loan eligibility rules for the PPP; that the financial records the borrower provided to the lender fairly presented the financial condition of the borrower; and that the borrower would comply with MSLP limitations on employee compensation, refinancing and paying off of debts, and distributions of capital to owners, among other things.

<u>The Scheme to Defraud</u>

38.     In early April 2020, EBRAHIMZADEH applied to the SBA for a PPP loan for Corniche Capital through Bank C, where he had an established banking relationship. EBRAHIMZADEH claimed an average monthly payroll of $95,000 paid to Person 3 and himself. Bank C rejected the application because EBRAHIMZADEH could not substantiate his claimed payroll.

39.    Also in early April 2020, EBRAHIMZADEH applied to the SBA for an EIDL loan for Corniche Capital, which he identified as a "real estate developer." By letter dated April 28, 2020, the SBA denied the loan application because Corniche Capital was not "engaged in an eligible business activity."

40.    Thereafter, and continuing until at least March 2022, knowing that Corniche Capital and his business activity as a real estate developer/investor made him ineligible for CARES Act loans under SBA rules, EBRAHIMZADEH nevertheless sought to and did fraudulently obtain CARES Act loans for Corniche Capital, both directly and through defunct or shell entities he controlled. EBRAHIMZADEH obtained these loans through the submission of false and misleading business, payroll, and financial information to the SBA, the Boston Fed, and banks that processed CARES Act loan applications or that opened accounts for EBRAHIMZADEH to receive or to disburse CARES Act funds.

Object and Purposes of the Scheme to Defraud

41.    The object of the scheme to defraud was to obtain CARES Act loan funds by means of false and fraudulent pretenses, representations, and promises that EBRAHIMZADEH made to the SBA, the Boston Fed, Bank A, Bank B, Bank C, and the IRS.

42.    The principal purposes of the scheme to defraud was to fund EBRAHIMZADEH's investments, to enrich EBRAHIMZADEH, to acquire personal homes for EBRAHIMZADEH and for Person 5, and to pay off EBRAHIMZADEH's debts and legal judgments.

Manner and Means of the Scheme to Defraud

43.    Among the manner and means by which EBRAHIMZADEH and persons known and unknown to the Grand Jury carried out the scheme to defraud were the following:

a.    Falsely certifying that EBRAHIMZADEH's businesses were eligible under SBA

rules in an effort to obtain CARES Act loans;

b.    Reporting false financial information to lenders;

c.    Submitting loan applications for defunct companies;

d.    Hiding debts and liabilities from lenders;

e.    Overvaluing assets or ownership of assets in loan applications;

f.    Creating false payroll records in an effort to obtain CARES Act loan forgiveness;

g.    Submitting false tax returns;

h.    Using CARES Act loan proceeds to purchase personal real estate;

i.    Using CARES Act loan proceeds to purchase personal goods;

j.    Making false statements to bank compliance personnel about transactions involving CARES Act loan proceeds; and

k.    Paying off CARES Act loans with proceeds from a separate loan fraud.

Acts in Furtherance of the Scheme to Defraud

*First Draw PPP Loan / Bank A*

44.    On or about April 6, 2020, EBRAHIMZADEH emailed Person 1 at Bank A concerning a PPP loan for Corniche Capital and told her that his "one month payroll" was $95,000.

45.    On or about April 24, 2020, EBRAHIMZADEH applied through a commercial lender for a $302,700 PPP loan to himself as the president and sole proprietor of Corniche Capital, which he claimed had an average monthly payroll of $121,100 – notwithstanding that the application included instructions about how to calculate average monthly payroll based on annual salaries or wages, capped at $100,000 per employee, such that the maximum average monthly payroll for a company with one employee was $8,333.

46.     On or about the same day, EBRAHIMZADEH submitted a PPP application to Person 1 for Corniche Capital and under Corniche Capital's IRS EIN for $302,700.  In that application, EBRAHIMZADEH falsely represented, among other things, that Corniche Capital was an eligible business under SBA rules and had an average monthly payroll of $120,100, when, under SBA rules, his average monthly payroll was capped at $8,333, because Corniche Capital had no employees other than him.

47.     On or about April 27, 2020, EBRAHIMZADEH submitted a second PPP application for Corniche Capital to Person 1, this time under EBRAHIMZADEH's Social Security number and seeking a higher loan amount of $308,627.

48.     In the April 27, 2020 application, EBRAHIMZADEH again falsely represented, among other things, that Corniche Capital was an eligible business under SBA rules and that Corniche Capital had a higher average monthly payroll of $123,451, when, under SBA rules, his average monthly payroll was capped at $8,333.

49.     On or about the same day, EBRAHIMZADEH sent Person 1 a signed IRS Schedule C, Profit or Loss from Business, for Corniche Capital for 2019 that showed that Corniche Capital had not paid any wages at all in 2019.

50.     On or about April 29, 2020, Person 1 told EBRAHIMZADEH that Bank A processed his application for the higher amount loan amount specified in paragraph 47 based on the purported higher monthly payroll specified in paragraph 48.

51.     On or about the same day, Person 1 told EBRAHIMZADEH that Bank A would also try "to input the second application" for the lesser amount specified in paragraph 46, based on the lower purported monthly payroll "to see if SBA accepts."

52.     On or about May 7, 2020, Person 1 told EBRAHIMZADEH to re-apply for a PPP loan in his name as sole proprietor of Corniche Capital, but not in Corniche Capital's name.

53.     On or about the same day, EBRAHIMZADEH submitted a new PPP application to Person 1 for a loan for $308,627 under his own name and Social Security number as a sole proprietor of Corniche Capital, and repeated the false representations in his previous applications.

54.     No later than May 15, 2020, Bank A submitted EBRAHIMZADEH's fraudulent PPP application described in paragraph 53 to the SBA, and on or about the same day, the SBA funded the loan.

55.     After receiving $308,530.19 in PPP loan proceeds from the SBA, EBRAHIMZADEH spent the PPP loan proceeds on diamond jewelry, personal items, gifts, and personal real estate, and not for payroll.

56.     After receiving the PPP loan as the sole proprietor of Corniche Capital using his Social Security number, EBRAHIMZADEH then fraudulently applied for more PPP loans for Corniche Capital, through other lenders, specifically:

a.     On or about May 16, 2020, he applied for a PPP loan for Corniche Capital through a commercial lender, but claimed that Corniche Capital had an average monthly payroll of $290,808 and sought a PPP loan of $727,000;

b.     On or about May 21, 2020 and again on or about May 23, 2020, he re-applied for a PPP loan for Corniche Capital through the same commercial lender, but claimed an average monthly payroll of $390,800 and sought a loan of $774,500; and

c.     On or about June 2, 2020, he applied for a PPP loan through a different commercial lender for Corniche Capital, but claimed an average monthly payroll of only $8,333 and sought a loan of $20,800.

57.    On each of these applications, EBRAHIMZADEH falsely certified, among other things, that his business was eligible under SBA rules and that he was "not engaged in any activity that is illegal under federal, state, or local law," when, in fact, he knew that he had repeatedly submitted fraudulent loan applications.

*Defunct Company EIDL Loans / Bank B and Bank C*

58.    As a further part of the scheme, EBRAHIMZADEH fraudulently applied for and obtained a series of EIDL loans to fund Corniche Capital and his lifestyle.

59.    To execute the scheme, EBRAHIMZADEH fraudulently opened bank accounts at Bank B in the names of defunct companies in order to receive EIDL loan disbursements, including bank accounts for NM Gas Holdings 1 LLC, NM Gas Holdings 2 LLC, NMGH 1C LLC, NMGH 1D LLC, NMGH 1E LLC, and NMGH 1F LLC.  In each instance, EBRAHIMZADEH supplied purportedly valid Wyoming corporate certificates from 2016, when he knew that Wyoming had administratively dissolved all of the companies by early 2018 for tax delinquency.

60.    To prepare EIDL applications, EBRAHIMZADEH used the services of Person 2, to whom EBRAHIMZADEH agreed to pay a percentage of any EIDL proceeds as a consulting fee that was not disclosed to the SBA.

61.    To obtain additional EIDL funds for himself, his family, and Corniche Capital, EBRAHIMZADEH also recruited Person 3, who, at EBRAHIMZADEH's direction, fraudulently opened bank accounts at Bank B in the names of Burbury Management and Great Neck Sky, falsely stating that Person 3 was the owner of the businesses and using false documents about Person 3's income and the revenue from the businesses.

62.    From about July 23 to about August 7, 2020, EBRAHIMZADEH submitted, or caused the submission of, the following fraudulent EIDL loan applications to the SBA, in an effort to obtain $150,000 EIDL loans to each of the entities indicated:

a.    EBRAHIMZADEH as sole proprietor of Corniche Capital, falsely certifying that he was engaged in an eligible business activity and not engaged in illegal activity;

b.    Corniche SRY, falsely stating, among other things, that Corniche SRY had $637,478 in gross revenues for 2019, when in fact it had $0;

c.    A family member as an independent contractor, falsely stating, among other things, that she had $425,000 in gross revenues in 2019, when, in fact, she reported $4,662 in gross receipts for 2019 in her tax filings;

d.    NM Gas Holdings 2 LLC, falsely stating, among other things, that it had $507,328 in gross revenues for 2019, when in fact it had $0;

e.    2501 North, falsely stating, among other things, that its business activity was "business services" rather than real estate leasing;

f.    Bentley Ridge, falsely stating, among other things, that it had $1.1 million in gross revenues for 2019, when in fact it had $0;

g.    NM Gas Holdings 1 LLC, listing himself as the owner and falsely stating, among other things, that it had $419,765 in gross revenues for 2019, when in fact it had $0;

h.    NMGH 1C LLC, falsely stating, among other things, that it had $328,700 in gross revenues for 2019, when in fact it had $0;

i.    Diamante Holdings, falsely stating, among other things, that it had $352,000 in gross revenues for 2019, when in fact it had $0;

13

j.      Burbury Management, Inc., falsely stating, among other things, that it had $375,000 in gross revenues for 2019;

k.      Great Neck Sky, falsely stating, among other things, that it had $399,763 in gross revenues for 2019, when in fact it had $0;

l.      NMGH 1D, falsely stating, among other things, that it had $359,703 in gross revenues for 2019, when in fact it had $0;

m.      NMGH 1E LLC, falsely stating, among other things, that it had $329,737 in gross revenues for 2019, when in fact it had $0; and

n.      NM Gas Holdings 1 LLC, falsely stating, among other things, that Person 3 was the owner and that it had $398,272 in gross revenues for 2019, when in fact, it had $0;

o.      NMGH 1F LLC, falsely stating, among other things, that it had $386,248 in gross revenues for 2019, when in fact it had $0.

63.      EBRAHIMZADEH received the fraudulent EIDL loan proceeds in accounts he controlled at Bank B and at Bank C.

64.      On or about August 23, 2020, knowing that he had already received an EIDL loan as the sole proprietor of Corniche Capital, EBRAHIMZADEH asked the SBA to reconsider its denial of his first EIDL application for a loan to Corniche Capital, thus fraudulently seeking an additional loan for the same business, based on the same purported revenue.

65.      Having received approximately $1.35 million in EIDL loan funds issued to entities other than Corniche Capital, all based on fraudulent applications, EBRAHIMZADEH used the proceeds, among other things, to pay Persons 2 and 3 kickbacks, fund a Corniche Capital property

acquisition, buy a personal residence in Manhattan, and fund his real estate investments (transferring funds to Corniche Capital's account at Bank A to do so).

66.     On or about May 12, 2021, EBRAHIMZADEH attempted to obtain an EIDL loan for West York Holding and submitted an application claiming that the entity had $526,800 in gross revenues and $295,962 in cost of goods sold for the twelve months before January 31, 2020, even though, as EBRAHIMZADEH knew, the company did not exist until February 2020.

67.     On or about March 15, 2022, EBRAHIMZADEH again applied to the SBA for an EIDL loan to Corniche Capital, seeking up to $2,000,000; he attached to his application a false statement of liabilities, which did not disclose numerous debts and judgments against EBRAHIMZADEH and Corniche Capital.

*MSLP Loan #1 / Corniche Capital*

68.     On or about May 22, 2020, EBRAHIMZADEH sent Person 1 financial information to qualify for additional loans beyond the PPP, including a "Personal Financial Statement" as of February 28, 2020, which, among other things, falsely claimed assets he did not have, omitted at least $6,282,561 in liabilities, and overstated the value and ownership of assets.

69.     No later than in or about June 2020, EBRAHIMZADEH decided to apply for an MSLP loan through Bank A.

70.     On or about June 5, 2020, EBRAHIMZADEH sent Person 1 a description of Corniche Capital's real estate investment projects and described himself as "a Manhattan based real estate and private equity investor focused on pursuing opportunistic value-add transactions."

71.     On or about June 11, 2020, EBRAHIMZADEH told Person 1 about another real estate acquisition by Corniche Capital and wrote, "Please increase my Main Street Loan to the $5.6 [million] based on the better understanding of my business."

72.    On or about June 22, 2020, EBRAHIMZADEH sent Person 1 a signed term sheet for an MSLP loan for $5,000,000 to Corniche Capital, acknowledging, among other things, that the purpose of the loan was to "maintain or reinstate ongoing operations and payroll as a result of the Coronavirus COVID-19 pandemic," that the MSLP was funded by the Boston Fed, that he would have to certify that Corniche Capital was an eligible business under SBA rules, that he could not use MSLP funds to pay off other debt, and that Corniche Capital could not make any distributions or pay special dividends to its owner with MSLP funds.

73.    On or about August 7, 2020, EBRAHIMZADEH executed and transmitted to Bank A an MSLP borrower certification that listed and included a signature of Person 4 as Corniche Capital's purported chief financial officer, even though Person 4 was not and had never been an officer or employee of Corniche Capital, and that falsely certified, among other things, that Corniche Capital was an eligible business under SBA rules, that neither EBRAHIMZADEH nor Corniche Capital were involved in illegal activity, and that EBRAHIMZADEH had submitted financial records to Bank A that accurately represented, in all material respects, the financial condition of Corniche Capital, when, in fact, he had overvalued his assets and not disclosed liabilities to Bank A.

74.    On or about the same day, EBRAHIMZADEH executed and transmitted to Bank A an MSLP loan and security agreement in which he falsely certified, among other things, that he was "not engaged in any activity that is illegal under federal, state, or local law," that he was not in default with respect to any court order, that Corniche Capital was not an "Ineligible Business" as defined in 13 C.F.R. § 120.110(b)-(j) and (m)-(s), that Corniche Capital had "no other indebtedness," that he would not use MSLP funds to refinance or pay off any debt, that he would

not make capital distributions, and that all financial information that he submitted to Bank A had been and would be true, correct, and complete.

75.     On or about the same day, EBRAHIMZADEH executed and transmitted to Bank A an MSLP guaranty of payment and performance agreement in which he falsely certified, among other things, that all financial information that EBRAHIMZADEH had provided to Bank A accurately presented his financial condition as guarantor and that EBRAHIMZADEH had not incurred any material liability, direct or indirect, that he had not disclosed to Bank A—even though by August 7, 2020, EBRAHIMZADEH, directly and indirectly through shell entities, had taken on $1,350,000 in EIDL debt that he had not disclosed to Bank A.

76.     On or about August 11, 2020, Bank A personnel caused MSLP loan documents, including false financial statements, to be transmitted from Bank A in Florida to the Boston Fed, which received the information electronically on its server in Illinois.  Bank A did not disclose to the Boston Fed that EBRAHIMZADEH told Person 1, and others at Bank A, that Corniche Capital was a real estate investment company.

77.     On or about August 13, 2020, the Boston Fed electronically transmitted a direction to Bank D in Boston, Massachusetts to wire money to Bank A in Miami, Florida, to fund the Corniche Capital MSLP loan.

78.     On or about the same day, Bank D wired money from Massachusetts to Bank A in Florida, which, after subtracting fees, disbursed $4,891,496 into Corniche Capital's account.

79.     After receiving the Corniche Capital MSLP loan funds, EBRAHIMZADEH used the funds, among other things, to fund the acquisition of the First Hamptons House in Long Island using Brick House New York LLC, to pay off the mortgage on a property in Pennsylvania, and to loan money to another real estate company.

*MSLP Loan #2 / Company A*

80.     No later than in or about October 2020, EBRAHIMZADEH and Person 5 decided to apply for an MSLP loan to Company A to fund the purchase of another personal home in Long Island.

81.     On or about October 23, 2020, Person 5 executed and transmitted to Person 1 an MSLP term sheet for a $1,675,500 loan to Company A, acknowledging, among other things, that the purpose of the loan was to "maintain or reinstate ongoing operations and payroll as a result of the Coronavirus COVID-19 pandemic," that the MLSP was administered by the Boston Fed, and that Company A would not make any capital distributions of MSLP funds or pay any special dividends to its shareholders.

82.     On or about October 30, 2020, EBRAHIMZADEH asked Person 1 to increase the amount of the MSLP loan being sought by Person 5 and Company A.

83.     On or about November 19 and 20, 2020, EBRAHIMZADEH sent Person 1 documents in support of Company A's MSLP application.

84.     On or about December 10, 2020, Person 5 directed his employee to sign an MSLP borrower certification as Company A's principal financial officer, and she did so without actually having reviewed any of the representations in the borrower certification.

85.     On or about the same day, Person 5 executed and transmitted to Bank A an MSLP borrower certification and a loan and security agreement, in both of which he falsely promised both not to pay himself more than his total compensation from Company A in 2019 ($832,111), and not to pay dividends or other capital distributions using MSLP loan funds, when in fact he planned to do both.

86.    On or about the same day, Bank A personnel caused MLSP loan documents to be transmitted from Bank A in Florida to the Boston Fed, which received the information electronically on its server in Illinois.

87.    On or about December 14, 2020, the Boston Fed electronically transmitted a direction to Bank D to wire money to Bank A in Miami, Florida, to fund Company A's MSLP loan.

88.    On or about the same day, Bank D in Massachusetts wired money to Bank A in Florida, which, after subtracting fees, disbursed $1,635,286.25 into Company A's account.

89.    On or about March 9, 2021, EBRAHIMZADEH wired $1,360,000 from a Corniche Capital bank account to an attorney for closing costs on the purchase of the Second Hamptons House.

90.    On or about March 10, 2021, Person 5 and Company A paid Corniche Capital $1,360,000 using MSLP funds to reimburse the closing costs on the Second Hamptons House.

91.    On or about March 19, 2021, Person 5 and Company A paid Corniche Capital $100,000 using MSLP funds.

*Second Draw PPP Loan / Bank A*

92.    Starting no later than December 2020, EBRAHIMZADEH employed Person 6, a tax preparer in New Jersey, to help him prepare and file tax returns that EBRAHIMZADEH needed to further his scheme to defraud.

93.    On or about December 24, 2020, EBRAHIMZADEH instructed Person 6 falsely to claim a non-operating business loss on his tax return for a condominium transaction pertaining to his personal residence in 2019.

94.    On or about December 26, 2020, EBRAHIMZADEH asked Person 6 to edit the draft IRS Form 1040 that Person 6 had prepared, as follows: "On 2019 return, you put real estate but maybe let's put consulting or real estate management/property management. The reason being, I will not qualify for PPP again as they don't allow real estate investment classification."

95.    On or about March 24, 2021, EBRAHIMZADEH applied for a Second Draw PPP loan of $20,833 to himself as a sole proprietor, and falsely certified, among other things, that he was not the owner of any other business, that he was engaged in an eligible business activity under SBA rules, and he was not engaged in any illegal activity—even though, as he then knew, he owned multiple businesses, was an ineligible real estate investor, had submitted multiple false loan applications to the SBA and to the Boston Fed, and was engaged in tax fraud.

96.    On or about the same day, EBRAHIMZADEH sent Person 1 a copy of his purported 2019 personal income tax return, which, in fact, he had not filed and which included a false deduction of $1,935,000 for a business loss in 2019, purportedly for the sale of a condominium that, in fact, he neither owned nor sold.

97.    On or about April 13, 2021, after receiving $20,833 from the SBA in his personal account at Bank A, EBRAHIMZADEH transferred $19,500 to his Corniche Capital account at Bank A, out of which, he spent the PPP loan funds on modern art and on roofing, not for payroll.

*PPP Loan Forgiveness / Bank A*

98.    On or about March 17, 2021, EBRAHIMZADEH instructed Person 6 to write off fake employee expenses in EBRAHIMZADEH's 2020 income tax return.

99.    On or about August 20, 2021, EBRAHIMZADEH submitted a PPP loan forgiveness application for his first draw PPP loan to Bank A that falsely stated that he paid $297,755.08 in payroll in 2020, when, as he knew, he had not paid any employees in 2020.

100.    In about August 2021, at EBRAHIMZADEH's instruction, Person 6 prepared a payroll spreadsheet that falsely reported that EBRAHIMZADEH had paid six employees in 2020, on a weekly basis, from January 3, 2020 through December 25, 2020, for a total of $599,997.84 in aggregate compensation and employment taxes.

101.    In about the same month, EBRAHIMZADEH caused the false payroll spreadsheet listing the six fake employees' compensation to be submitted to Bank A and the SBA.

102.    On or about October 15, 2021, EBRAHIMZADEH signed an IRS Form 8879, IRS e-file Signature Authorization, swearing under penalty of perjury that his 2020 Form 1040 was true, correct, and accurate, even though as he then knew, his income tax return falsely reported $599,998 in wages paid.

103.    On or about October 16, 2021, EBRAHIMZADEH caused his IRS Form 1040 for 2019, which falsely reported a business loss of $1,935,000 to be filed electronically from New Jersey to the IRS processing center in Andover, Massachusetts.

104.    On or about the same day, EBRAHIMZADEH caused his IRS Form 1040 for 2020, which falsely reported $599,998 in wages paid, to be filed electronically from New Jersey to the IRS processing center in Andover, Massachusetts.

105.    On or about October 25, 2021, EBRAHIMZADEH provided Person 1 at Bank A with a copy of his fraudulent 2020 individual income tax return, in support of his PPP loan forgiveness application.

106.    On or about the same day, EBRAHIMZADEH signed an IRS Form 8879, IRS e-file Signature Authorization, swearing under penalty of perjury that his 2019 Form 1040 was true, correct, and accurate, even though as he then knew, his income tax return falsely reported a business loss of $1,935,000, based on a non-existent sale of a condominium.

107.    On or about November 8, 2021, at EBRAHIMZADEH's direction, Person 6 uploaded to Bank A for submission to the SBA unfiled IRS Forms 941 that falsely stated that EBRAHIMZADEH had paid employees in 2020.

108.    On or about July 8, 2022, EBRAHIMZADEH instructed Person 6 to file for forgiveness for his Second Draw PPP loan, and Person 6 warned EBRAHIMZADEH that if he pursued forgiveness for his PPP, EBRAHIMZADEH's fraud could be detected, explaining, "[Y]our bank accounts will not show any checks coming out in the form of payroll checks, unless you say that you do after the fact payroll and you actually wrote checks to the people for something else and you allocate it as payroll. THIS CON IS HUGE."

109.    On or about August 12, 2022, Person 6 again warned EBRAHIMZADEH that if he appealed the denial of his PPP forgiveness application, the fraud might be detected, stating, "The main issue [] is that you were not eligible for the loan in the first place. You had no employees in 2019. . . . The SBA wants to see bank statements showing where you paid your employees (don't exist) and they want to see the 941's (which haven't been filed). If we file them late and then still denied, then you get hit with a double whammy."

*The Cover-Up / False Statements to Bank A and the Boston Fed*

110.    On or about October 19, 2020, EBRAHIMZADEH signed a confidential agreement with Person 4 that together they would acquire the First Hamptons House through Brick House NY LLC, all with the purpose of hiding EBRAHIMZADEH's ownership of the home, which EBRAHIMZADEH acquired with MSLP funds.

111.    Starting in about November, 2020, EBRAHIZADEH completed and caused to be transmitted to Bank A quarterly MSLP covenant certifications that falsely reported, among other things, that Corniche Capital's debts amounted to only $5,000,000, when he knew that he had

millions in additional debt, including from fraudulent EIDL loans he had obtained through defunct companies, and that EBRAHIMZADEH had fully complied with all the requirements of the MSLP, when he knew that, as a real estate investor and developer, he was ineligible for CARES Act loans; he had spent MSLP funds, among other things, to acquire the First Hamptons House, to lend money, and to pay off pre-existing debt before it was due; and he was actively engaged in criminal conduct by obtaining CARES Act loans through fraud.

112.    On or about February 4, 2021, in response to a question from Bank A about the source of funds for transfers of $352,000 on August 5, 2020, and of $149,900 on August 7, 2020, from an account held by Corniche SRY to the Corniche Capital account at Bank A, EBRAHIMZADEH falsely stated that the money came from "property rental," when, as he then knew, all of the money derived from fraudulent EIDL loans that he had obtained for NM Gas Holdings 2, NMGH 1C, and Great Neck Sky.

113.    On or about February 13, 2021, in response to a question from Bank A about the expenditure of $54,000 of his PPP loan to acquire the First Hamptons Home, EBRAHIMZADEH falsely told Bank A that he was not a partner or an owner of the property, even though he knew that he lived in the home, had paid for the home with MSLP funds, and kept contemporaneous financial records in which he claimed a 50 percent ownership of the property.

114.    On or about the same day, in response to further questions from Bank A about the source of the property rental income that funded the transfers from the Corniche SRY account to the Corniche Capital account in August 2020, EBRAHIMZADEH falsely told Bank A that the rental income came from a property at 2427 West York Street, in Philadelphia, when as he then knew, all of the money derived from EIDL loan fraud.

115.    On or about June 7, 2021, Person 5 completed and caused to be transmitted to Bank A an MSLP covenant certification for the first quarter of 2021 that falsely reported, among other things, that Company A had fully complied with all the requirements of the MSLP, when in fact EBRAHIMZADEH and Person 5 had used the MSLP funds to acquire the Second Hamptons House.

116.    In about July 2022, EBRAHIMZADEH defaulted on the MSLP loan to Corniche Capital.

117.    In about May 2024, after being informed by the United States Department of Justice that he would likely be charged with federal crimes related to his fraudulent MSLP and EIDL loans, EBRAHIMZADEH repaid the CARES Act loans he obtained through fraud by securing a private commercial loan based on false certifications that included, among other things, that he was not under any government investigation that could materially affect his performance on the private loan and that he had properly paid all of his taxes in at least 2019 and 2020.

## COUNT ONE
### Bank Fraud
(18 U.S.C. § 1344)

The Grand Jury further charges:

118.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 117 of this Indictment.

119.     On or about August 7, 2020, in the District of Massachusetts, and elsewhere, the defendant,

### DAVID EBRAHIMZADEH,

willfully executed, and attempted to execute, a scheme and artifice to defraud a financial institution, that is, Federal Reserve Bank of Boston, and to obtain moneys, funds, credits, assets, securities and other property owned by and under the custody and control of the Federal Reserve Bank of Boston, by means of materially false and fraudulent pretenses, representations, and promises, to wit, EBRAHIMZADEH submitted false financial information and fraudulent borrower certifications to obtain funds through the MSLP program.

All in violation of Title 18, United States Code, Section 1344.

## COUNTS TWO AND THREE
### Wire Fraud Affecting a Financial Institution
### (18 U.S.C. §§ 1343 and 3293(2))

The Grand Jury further charges:

120.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 117 of this Indictment.

121.    From at least in or about April 2020 through at least in or about January 2023, in the District of Massachusetts and elsewhere, the defendant,

### DAVID EBRAHIMZADEH,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, affecting a financial institution, as set forth below:

| Count | Approximate Date | Description |
|:---:|:---:|:---|
| 2 | August 14, 2020 | Wire by Bank D of MSLP Funds for Corniche Capital from Massachusetts to Bank A in Florida |
| 3 | December 14, 2020 | Wire by Bank D of MSLP Funds for Company A from Massachusetts to Bank A in Florida |

All in violation of Title 18, United State Code, Sections 1343 and 3293(2).

## COUNT FOUR
Wire Fraud
(18 U.S.C. § 1343)

The Grand Jury further charges:

122.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 117 of this Indictment.

123.    On or about October 16, 2021, the defendant

### DAVID EBRAHIMZADEH,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit:  the electronic filing of a false tax return for tax year 2020 from New Jersey to Massachusetts in support of a PPP forgiveness application.

All in violation of Title 18, United State Code, Section 1343.

<u>COUNT FIVE</u>
Procuring the Filing a False Tax Return
(26 U.S.C. § 7206(2))

The Grand Jury further charges:

124.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 117 of this Indictment.

125.     On or about October 16, 2021, in the District of Massachusetts, and elsewhere, the defendant,

DAVID EBRAHIMZADEH,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under, and in connection with any matter arising under, the internal revenue laws, of an U.S. Individual Income Tax Return, Form 1040 return, for the tax year 2019, which was fraudulent and was false as to any material matter, specifically that it falsely reported a business loss of $1,935,000 from the non-existent sale of a condominium on line 2 of Form 4797, Sale of Business Property.

All in violation of Title 26, United States Code, Section 7206(2).

28

## COUNT SIX
### Procuring the Filing a False Tax Return
### (26 U.S.C. § 7206(2))

The Grand Jury further charges:

126.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 117 of this Indictment.

127.    On or about October 16, 2021, in the District of Massachusetts, and elsewhere, the defendant,

### DAVID EBRAHIMZADEH,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under, and in connection with any matter arising under, the internal revenue laws, of an U.S. Individual Income Tax Return, Form 1040 return, for the tax year 2020, which was fraudulent and was false as to any material matter, specifically that it falsely reported wage expenses of $599,998 on Schedule C, line 26.

All in violation of Title 26, United States Code, Section 7206(2).

## FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(2))

128.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1344 and 1343, set forth in Counts One through Four, the defendant,

## DAVID EBRAHIMZADEH,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses.

129.    If any of the property described in Paragraph 128, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2), as a result of any act or omission of the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 128 above.

All pursuant to Title 18, United States Code, Section 982(a)(2).

A TRUE BILL



KRISS BASIL
ELIANNA NUZUM
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


District of Massachusetts: December 11, 2025
Returned into the District Court by the Grand Jurors and filed.

Dawn MiKing  11:42am
DEPUTY CLERK